UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


DEANNE CASEY,
     Plaintiff,


        v.                       CIVIL ACTION NO. 2012-10246-MPK[1]


STG INTERNATIONAL, et al.,
SYLVIA MATHEWS BURWELL,[2] in her capacity
as Secretary of the Department of Health and Human Services,
DEBORAH LEE JAMES,[3] in her official capacity
as Secretary of the United States Air Force,
     Defendants.


MEMORANDUM AND ORDER ON
DEPARTMENT OF HEALTH AND HUMAN SERVICE'S [sic]
MOTION FOR SUMMARY JUDGMENT (#136)

KELLEY, U.S.M.J.

I. Introduction

On February 8, 2012, plaintiff Deanne Casey filed a five-count complaint

alleging violations of her First and Fifth Amendment rights under federal law as

well as state law claims for breach of contract, assault and battery and false

---

[1]

    With the parties' consent, this case was reassigned to the undersigned for all purposes, including trial and the entry of judgment, pursuant to 28 U.S.C. § 636©.

[2]

    Pursuant to Rule 25(d), Fed. R. Civ. P., Sylvia Mathews Burwell is substituted for Kathleen Sebelius as Secretary of Department of Health and Human Services.

[3]

    Pursuant to Rule 25(d), Fed. R. Civ. P., Deborah Lee James is substituted for Michael Donley as Secretary of the Air Force.

imprisonment.  (#1)  The complaint has progressed through several iterations, with the operative pleading now being the third amended complaint (#74) filed on February 19, 2013, against STG International, Kathleen Sebelius (now Sylvia Mathews Burwell), Secretary of the United States Department of Health and Human Service, and Michael Donley (now Deborah Lee James), Secretary of the United States Air Force.

On March 4, 2013, the federal defendants filed a motion to dismiss (#75), along with a memorandum in support.  (#76)  Two weeks later, Casey filed an opposition to the dispositive motion.  (#89)  The defendants filed a reply brief (#97) on April 10, 2013.

On June 28, 2013, a hearing was held on the motion to dismiss and Judge Collings, the Magistrate Judge to whom the case was then assigned, converted the motion into one for summary judgment.  (#104)  The case was referred to ADR before Magistrate Judge Boal.  (#114)  On September 24, 2013, Michael Donley was voluntarily dismissed as a defendant by Casey.  (#115)  Magistrate Judge Boal reported that the ADR held on December 20, 2013 had led to a settlement between Casey and STG International.  (#127)

On May 9, 2014, the United States  Department of Health and Human Services moved for summary judgment (#136) on Count V of the third amended

complaint, an alleged violation of Title VII, 42 U.S.C. § 2000e *et. seq.* That

motion has been fully briefed (#137-#139, #147- #153, #155, #156), and stands

ready for decision.

## II. The Facts

The undisputed facts are as follows. Deanne Casey worked at Hanscom Air

Force Base, Bedford, Massachusetts ("Hanscom") from 2007-2011. (#137 ¶ 1;

#148 ¶ 1) Casey was hired as a Nurse Coordinator by STG International ("STG"),[4]

on January 26, 2010.[5] (#137 ¶ 1; #148 ¶ 2) While she was given the new title of

Health Promotion Coordinator ("HP Coordinator") effective February 1, 2010, her

duties did not change. (#148 ¶ 2) Casey provided health services[6] at Hanscom for

the Civilian Health Promotion Service ("CHPS") program. (#137 ¶ 1; #148 ¶ 3)

The CHPS program was created pursuant to an interagency agreement

between Federal Occupational Health ("FOH"), a division of the United States

---

[4]

STG is sometimes referred to as STGi.

[5]

The Department of Health and Human Services has no record of Casey's ever having been a federal employee. (#155-1 ¶ 6)

[6]

Casey was responsible for teaching classes, performing blood pressure screenings and cardiac risk profile screenings, and conducting other health and fitness activities for civilian personnel employed at Hanscom. (#137 ¶ 2; #148 ¶¶ 22, 24)

Department of Health and Human Services ("HHS"),[7] and the U.S. Air Force Materiel Command ("AFMC").[8]  (#137 ¶ 3; #148 ¶ 3)  The purpose of the CHPS program was to provide occupational health services to civilian AFMC employees. (#137 ¶ 3; #148 ¶¶ 4, 5)  The CHPS program was operated for FOH by private contractors.  (#137 ¶ 4; #148 ¶ 14)  STG was initially the contractor with FOH for the CHPS program; in 2010, Millenium Health and Fitness ("Millenium") became the prime contractor, with STG becoming a subcontractor of Millennium.  (#137 ¶ 4; #148 ¶ 11)

The terms of the subcontract between STG and Millennium state:

> All persons provided by Subcontractor [STG], including subcontractors, shall be considered solely Subcontractor's employees or agents; and Subcontractor shall be responsible for compliance with all laws, rules, and regulations involving, but not limited to, employment of labor, hours of labor, working conditions, payment of wages and payment of taxes, such as unemployment, social security and other payroll taxes, including applicable contributions from such persons when required by law.
>
> All work performed by Subcontractor in connection with

---

[7]

FOH is a division within HHS, and as such HHS has been named as the defendant for the alleged misconduct by FOH.  The Court shall refer to them interchangeably except where specificity is required.

[8]

AFMC is considered to be the defendant's client under the contract between FOH and AFMC. (#148 ¶ 21)

the products or services described in this Subcontract
shall be performed by Subcontractor as an Independent
Contractor and not as the agent of the Prime.

#137 ¶ 27; #137-1 ¶ C.5.

According to the terms of the Millenium-HHS contract,[9] "FOH manages
over 60 Health Promotion (HP) Programs and Wellness/Fitness (WF) Centers . . .
[and] [t]he purpose of this contract is to Manage FOH Wellness/Fitness Center
Membership Accounts and obtain Support Staff for the Health Promotion and
Wellness/Fitness Programs provided by FOH."  (#148-4 at 35, 36)  The
subcontract required STG to provide the necessary personnel, supplies, and
services to perform Millenium's obligations under its contract with HHS.  (#148 ¶
12)

The contract further specifies that Hanscom was to have one HP Coordinator
who was to work 1,456 hours in a 12-month period at a rate of $41.58 per hour.
(#148-4 at 12)  The minimum qualifications of the various levels of HP
Coordinators and the tasks those individuals were to perform are detailed in the
contract.  (#148-5 at 46-48)  The terms of the contract require that "the contractor
shall provide a list of proposed HP/WF candidates with resumes, expiration dates

---

[9] The Millenium-HHS contract is referenced as "the contract." The contract was to be fulfilled
by STG pursuant to the subcontract between Millenium and STG.

of licenses, registrations and certificates to the COTR[10] for review with 30 calendar days after the date of contract award."  (#148-5 at 59)  The contract provides that "[t]he contractor shall provide on-site HP/WF Staff to perform the services described herein during the hours of operation of the SPS being served, or hours established by FOH."  (#148-5 at 66)[11]

During the relevant time period, Susan Steinman served as the Associate Deputy Director of Wellness Fitness Services at FOH.  (#148 ¶ 6)  It was Steinman's job to oversee the health promotion services provided by FOH to AFMC.  (#148 ¶ 6)

Casey was hired by STG and was a contract employee of STG.  (#137 ¶¶ 5, 6)  In October 2010 the plaintiff executed a "rehire" agreement with STG.[12]   STG

---

[10]

COTR stands for the "Contractor Officer's Technical Reviewer."  For CHPS, that person was Kari Lockett, an HHS employee.  (#148 ¶¶ 16, 17)

[11]

In this instance, Casey worked at Hanscom, a secure facility, and her schedule was controlled by Hanscom and the United States Air Force.  (#155 at 5; #162-1, Attachments F and G)

[12]

This "rehire" agreement was signed at or about the time that Millenium became the prime contractor to FOH, and STG became a sub-contractor to Millenium.  The "rehire" agreement provided:

> As a full-time employee, you will be eligible to participate in [STG's] health, dental and vision plans, 401(k) retirement savings plan, flexible spending accounts, commuter benefits, voluntary life and accidental death and dismemberment insurances, short term and long term disability, education assistance program, and ten (10) federal holidays with pay.  Your Paid Time Off (PTO) will be

established and paid Casey's salary (#137 ¶ 7; #148 ¶ 25);  provided the plaintiff's

paycheck and W-2 forms (#137 ¶ 7); and provided the plaintiff's employee

benefits, such as insurance and a retirement account.  (#137 ¶ 19)   Casey's

supervisor was Jesse Burk, an STG employee and later a Millenium employee.[13]

(#137 ¶¶ 8, 9)  Burk oversaw the CHPS program at eight Air Force bases

throughout the country for STG and then Millenium.  (#137 ¶ 9)  Burk worked in

an HHS building in Atlanta and had an HHS email address.[14]  (#148 ¶ 7)

While she was employed by STG, Burk did Casey's annual performance

evaluations.  (#137 ¶ 10)  Casey's performance was evaluated based on standards

developed by FOH.  (#148 ¶ 25)  The plaintiff's performance reviews were

completed on STG letterhead with Burk providing the content.  (#137 ¶ 12; #148 ¶

---

accrued in accordance with the policy and terms of the contract
under which you are employed. . . .

Please note that [STG] has a policy of "employment-at-will" and,
as such, either party may decide to facilitate separation at any time.

#137-2.

[13]

Although Burk continued to oversee the CHPS program when she became a employee of
Millenium, Casey was no longer her direct report. (#137 ¶ 9; #148 ¶ 19)  Burk did, however,
continue to supervise the plaintiff and provided feedback and recommendations for Casey's
performance reviews. (#137 ¶ 11; #148 ¶ 19)

[14]

Steinman worked with Burk to ensure that the FOH CHPS program met the requirements
of AFMC. (#148 ¶ 8)

25)  When Casey requested time off, the request went to STG and was scrutinized

by Burk.[15]  (#137 ¶ 13; #148 ¶ 32)   Issues concerning Casey's job performance

were brought to Burk's attention.  (#137 ¶ 20)  Burk was responsible for

recommending discipline of Casey based on her review of the plaintiff's work.[16]

(#148 ¶ 26)

FOH developed all the educational material and content for the CHPS

program. (#148 ¶ 23)  Based on the FOH requirements, Burk developed the classes

that Casey taught.  (#137 ¶ 16; #148 ¶ 24)  If the plaintiff had a question about a

class, she asked Burk.  (#148 ¶ 24)  Burk decided what classes Casey would teach

each month, as well as the minimum number of classes to be taught.  (#137 ¶¶ 14,

15)   The plaintiff would report to Burk the number of people attending the classes.

(#137 ¶ 15)   Burk and AFMC established the minimum number of health

screenings to be done each week, and Burk gave Casey quotas for cholesterol

measurements.  (#137 ¶ 14; #148 ¶ 28)  Casey sent her monthly calendar to Burk

---

[15]

The plaintiff used an FOH time keeping system to keep track of her time, and FOH used that information to send invoices to its clients.  (#148 ¶ 31)  According to the terms of the contract, "FOH program operations are critically dependent on its MIS [Management Information Systems] which accumulates data on all of the services and consultation FOH provides to client Federal government agencies.  The system provides information to clients on services rendered and generates reports used for program planning, monitoring and billings." (#148-5 at 62)

[16]

Burk was aware of issues with the plaintiff's job performance and, in fact, prepared two Request for Discipline forms to STG in this regard. (#137 ¶ 21)

who reviewed it to ensure that the appropriate number of classes and screenings were being offered.  (#148 ¶ 29)  Casey and Burk communicated by email and telephone, discussing what was happening at Hanscom and what, if any, assistance the plaintiff needed and any difficulties Casey had encountered.  (#137 ¶ 17; #148 ¶ 34)

Casey was the only CHPS contract employee at Hanscom.  (#137 ¶ 22)  The plaintiff worked independently; no one at Hanscom supervised her work.  (#137 ¶¶ 24, 25)  Casey's office was located at Hanscom's Health and Wellness Center ("HAWC").  (#137 ¶ 23)

On November 10, 2011, Casey reported an alleged assault and battery by William Carpenter, a Department of Defense employee, to the military police on Hanscom.  (#148 ¶ 37)  Burk learned of the alleged assault on November 14, 2011 when Judith Holl, the Team Lead for Occupational Health and Wellness for AFMC, notified her.  (#148 ¶ 39)   Burk, in turn, called Steinman.  (#148 ¶ 39) Upon being informed about the incident, Steinman emailed Kari Lockett, the person to whom she reported at HHS, and advised Lockett about the alleged assault.  (#148 ¶ 40)  Steinman told Lockett that Holl was requesting that Casey be "removed from the [CHPS] program."[17]  (#148-12)  Steinman further wrote, "I also

---

[17]   Holl testified as follows at the deposition:

feel that there is adequate information to request her termination, but unsure if we can request this." (#148-12)

At 3:38 p.m. on November 14, 2011, Burk emailed Holl to advise that she, Burk, had spoken with STG about Casey. (#148 ¶ 42)   Burk wrote:

> [STG is] going to use the last two write ups against her [Casey], and have a discussion with her concerning those and her performance review that I just did, to let her know things are not looking good as far as her performance.  They are going to check with their higher ups to make sure everything is good to go legally to remove [Casey] from this position, their concern was if there was a police report filed, this will look like retaliation against her for filing the police report.  The way I explained to them was, regardless of what happened last Thursday afternoon, I was ready to let her go, prior to the 'alleged incident.'  So if you could get me something in writing by tomorrow morning requesting her removal from the position, that way we can get the ball rolling on that end.

-----

Q.  Did you ask FOH to terminate her [Casey]?

A.  No, I am not sure that I asked them to terminate her.  It was - the first part of it was to get her off of the base.  I never - again, we don't have the authority to do that.  I can't ask them - I told them that she couldn't work on the base.  I mean, she couldn't come on the base . . . . My sole focus was to get an unresponsive contractor under control and off the base.

#162-1 at 90-1.

#148-13.[18]

On November 15, 2011, Holl emailed Burk and Steinman, writing:

> I have grave concerns about Ms. Casey's presence on
> Hanscom AFB - - - putting her performance issues aside
> at this point, she has created a hostile working
> environment for herself and the HAWC staff by not
> dialoguing with Capt Norris or the medical group staff to
> help stabilize the situation . . . . [S]he is not returning
> calls to Jesse either, and therefore we cannot have her
> unaccounted for on the base not answering to the military
> oversight to her presence.
>
> It is in the best interest of the AF and Hanscom to have
> her removed immediately from the base and her ID card
> confiscated.  I request FOH to handle this situation and
> notify her of her removal.

#148-15.

Later that morning, Burk wrote that she and Steinman "feel that [Casey] has

violated several of the automatic suspension/termination policies."  (#148-16)  At

or about 1:00 p.m. on November 15  Burk requested that Maribel Contreras, STG

Employee Relations Manager, send an email to Casey "stating that we are trying to

locate her to release her via phone to terminate."  (#148-18)   Within the hour,

Burk spoke with Casey; Burk then emailed Holl that the plaintiff had been notified

---

[18]

On or about November 10, 2011, Burk had drafted a Request for Discipline Form for
Casey outlining a four week performance improvement plan which did not include termination.
(#148-14)

that she was "being put on administrative leave for the rest of the day and tomorrow.  She has been notified that someone will be there to escort her off base this afternoon.  FOH is drafting the necessary documents to terminate by the end of the week."  (#148-19)

On November 16, 2011, in response to an inquiry from Holl, Burk emailed that "FOH/STGi is absolutely pressing on with this termination."  (#148-20) Also on November 16, Contreras emailed her boss at STG and Burk that she was "ready to move forward with the communication to [Casey] that we are terminating her employment effective yesterday, based on client request for removal.  We cannot continue to wait for the written communication from FOH.  I will use the documentation from the AF as support for client requests your removal."  (#148-21)

Casey was fired by STG employees on November 17, 2011.  (#137 ¶ 28; #148-55)   The plaintiff received a written package of "Exit Information" from STG.  (#137 ¶ 28)

### III. Summary Judgment Standard

The purpose of summary judgment is "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required."  *Rojas-Ithier v. Sociedad Espanola de Auxilio Mutuo y Beneficiencia de*

*Puerto Rico*, 394 F.3d 40, 42 (1st Cir. 2005) (internal quotations marks and citation omitted). When considering a motion for summary judgment, "a court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of asserting the absence of a genuine issue of material fact and "support[ing] that assertion by affidavits, admissions, or other materials of evidentiary quality." *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003) (citations omitted). "Once the moving party avers the absence of genuine issues of material fact, the non-movant must show that a factual dispute does exist, but summary judgment cannot be defeated by relying on improbable inferences, conclusory allegations, or rank speculation." *Fontánez-Núñez v. Janssen Ortho LLC*, 447 F.3d 50, 54-55 (1st Cir. 2006) (internal quotation marks and citation omitted).

In determining whether summary judgment is proper, "a court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor." *Clifford v. Barnhart*, 449 F.3d 276, 280 (1st Cir. 2006). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's

13

case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (further internal quotation marks omitted)).

## IV. Discussion

As the basis for seeking summary judgment on the civil rights claim alleged in Count V of the third amended complaint, HHS contends that Casey was not an employee of the federal government, and, therefore, as a matter of law is not afforded the protections of Title VII.[19] (#137 at 1) Alternatively, if Casey is deemed to be a federal employee, HHS argues that she failed to meet the 45-day deadline for contacting an EEO counselor, a requirement for exhaustion of administrative remedies under Title VII, and there is no basis for equitable tolling of the deadline. (#137 at 1)

*A. Casey's status as a federal employee*

---

[19] Casey does not deny that she was employed by STG, but argues that "a plaintiff may, in certain circumstances, have more than one 'employer' for purposes of Title VII liability." *King v. Dalton*, 895 F. Supp. 831, 837 (E.D. Va. 1995).

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination based on race, color, religion, sex or national origin. Title 42 U.S.C. § 2000e *et seq*.

The First Circuit has explained that:

> In 1972, Congress amended the Act to waive the federal government's sovereign immunity for employment discrimination actions against various federal agencies and institutions and to permit federal court jurisdiction over such violations. 42 U.S.C. § 2000e-16(a); *see Brown [v. Gen. Servs. Admin]*, 425 U.S. [820,] at 829 [(1976)], 96 S.Ct. 1961.  Congress also outlined, as a condition of this waiver, a series of administrative remedies which a claimant must exhaust before filing suit in federal court. *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 94, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990); *Brown*, 425 U.S. at 833-34, 96 S.Ct. 1961. Under the amended Act, § 2000e-16(a) 'provides the exclusive judicial remedy for claims of discrimination in federal employment.' *Brown*, 425 U.S. at 835, 96 S.Ct. 1961.

*Misra v. Smithsonian Astrophysical Observatory*, 248 F.3d 37, 39 (1st Cir. 2001); *Munoz v. Mabus*, 630 F.3d 856, 861 (9th Cir. 2010) ("Section 717 of Title VII protects federal employees and provides an express waiver of sovereign immunity in suits against the government for discriminatory employment practices.");  *Perez v. Puerto Rico Nat. Guard*, 951 F. Supp.2d 279, 293 (D. Puerto Rico, 2013).

As the law has evolved, "it is now clear that [the term 'employee' in the statute] does not cover independent contractors.  Thus, an independent contractor may not maintain a Title VII action against the entity with which she contracts."

*Alberty-Velez v. Corporacion de Puerto Rico Para La Difusion Publica*, 361 F.3d

15

1, 6 (1st Cir. 2004) (internal citations omitted)[20] ; *Dykes v. DePuy, Inc.,* 140 F.3d

31, 37 n. 6 (1st Cir. 1998).

There is no dispute with respect to the applicable law.  The First Circuit has

held that, in the absence of any disputed issues of material fact, "a court may

decide the employee/independent contractor question as a matter of law if the

factors point so favorably in one direction that a fact finder could not reasonably

reach the opposite conclusion."  *Alberty-Velez*, 361 F.3d at 7.  When discussing the

relevant factors, the First Circuit has instructed that:

> we look to the guidelines in the Equal Employment
> Opportunity Commission (EEOC) Compliance Manual to
> address the question of whether an employment
> relationship exists.  [*Lopez v. Massachusetts*, 588 F.3d
> 69,] 85 [(1st Cir.2009)].  The guidelines list a series of
> 'non-exhaustive factors' that are indicative of an
> employment relationship:
>
> '[t]he employer has the right to control when, where, and
> how the worker performs the job;' '[t]he work does not
> require a high level of skill or expertise;' '[t]he work is
> performed on the employer's premises;' '[t]here is a
> continuing relationship between the worker and the
> employer;' '[t]he employer has the right to assign
> additional projects to the worker;' '[t]he employer sets

---

[20]    The Court in *Alberty-Velez* applied the "common law agency test" to determine whether the
plaintiff was an "employee" within the meaning of Title VII.  Although the later decision in *Barton
v. Clancy*, 632 F.3d 9 (1st Cir. 2011) established the 12-factor test to be used to make the
"employee" determination, *Alberty-Velez* remains relevant because the *Barton* factors encompass
the common law agency test.

> the hours of work and the duration of the job;' '[t]he worker is paid by the hour, week, or month rather than the agreed cost of performing a particular job;' '[t]he worker does not hire and pay assistants;' '[t]he work performed by the worker is part of the regular business of the employer;' '[t]he employer is in business;' '[t]he worker is not engaged in his/her own distinct occupation or business;' '[t]he employer provides the worker with benefits such as insurance, leave, or workers' compensation;' '[t]he worker is considered an employee of the employer for tax purposes;' '[t]he employer can discharge the worker;' and '[t]he worker and the employer believe that they are creating an employer-employee relationship.'

*Barton v. Clancy*,  632 F.3d 9, 18 (1st Cir. 2011) (quoting *Lopez v. Massachusetts*, 588 F.3d 69,] 85 [(1st Cir.2009) *Id.* (quoting 2 Equal Emp't Opportunity Comm'n, EEOC Compliance Manual, § 2–III, at 5716–17 (2008)) (alterations in original).

While each of these factors may not be pertinent in every circumstance, all aspects of the relationship must be considered in determining the nature of the employment.  *Alberty-Velez*, 361 F.3d at 7 n. 7; *Shervin v. Partners Healthcare Sys., Inc.*, 2 F. Supp.3d 50, 75 (D. Mass. 2014).

The material facts of this case are undisputed.  The parties do contest how the facts should be viewed, and which factors in the EEOC guidelines should be given more substantial weight in the analysis.  All the relevant facts shall be examined, and the parties' arguments addressed, in order to determine if Casey meets the definition of "employee" under Title VII.

1. Control over when, where, and how the worker performs the job

17

This factor is often noted to be the most crucial in the employee/independent contractor assessment. *Alberty-Velez*, 361 F.3d at 7 ("However, in most situations, the extent to which the hiring party controls 'the manner and means' by which the worker completes her tasks will be the most important factor in the analysis.") (citing *Eisenberg v. Advance Relocation & Storage, Inc*., 237 F.3d 111, 114 (2d Cir. 2000) (citing cases)); *Shervin*, 2 F. Supp.3d at 75. Casey argues that the minimum standards she was required to meet as a contractor were set by HHS. While that may be true, HHS contends that there is an expected minimal level of involvement that every government agency will have with a contractor, and these standards, as established in the contract between FOH and AFMC, do not exceed this level.

In *Dean v. U.S. Army,* 2009 WL 2460992 (E.D. Wash. Aug. 10, 2009), the plaintiff asserted that the Army's ability to influence her performance reviews demonstrated control and therefore its status as an employer. *Id.* at *3. The Court discredited this assertion, explaining that "presumably, any large government contract will be supervised to some extent by the relevant government agency. Yet the word 'employee' in § 2000e-16 clearly does not encompass every government contractor." *Id.* at *3. HHS argues that this reasoning is applicable here.

While FOH set the requirements for the CHPS program, in this case it was

Burk, an STG/Millenium employee, who developed the classes to meet the FOH

standards.  Burk determined the minimum number of classes to be taught each

month and what those classes were to be.  Burk and AFMC together established

the number of health screenings to be done on a weekly basis.  Burk was in charge

of the plaintiff's performance reviews and recommendations for improvement

plans and discipline.  Although Casey argues that HHS supervised her through

Burk, basically the only factors the plaintiff cites to support an agency relationship

between Burk and HHS are that Burk worked in an HHS building and had an HHS

email address.  While "[a]n independent contractor can act as an agent, or an

apparent agent," *Halpert v. Manhattan Apartments, Inc.*, 580 F.3d 86, 88 (2d Cir.

2009), the facts of this case are insufficient to show that Burk was an agent for

HHS.  Casey's conclusory assertion fails to raise a genuine issue of material fact.

Further, AFMC, not FOH, determined the hours during which Casey was to

work at Hanscom.  AFMC took an active role in the scheduling of Casey's classes

given that HAWC personnel had priority over the available classroom.  (#155-2 at

4)  The facility manager at the HAWC testified that because there is only one

classroom in the HAWC, there had been scheduling conflicts between AFMC and

CHPS classes.  *Id.*  When this occurred, Casey would be asked by AFMC to

reschedule her class to another date.  *Id.*   The plaintiff would submit her schedule

to the HAWC facility manager on a monthly basis in an attempt to avoid these conflicts.  (#155-2 at 4-5)

Considering all of the relevant circumstances, Casey has failed to show that HHS controlled the when, where and how she performed her job.   Rather, it was the plaintiff's STG supervisor and AFMC that exercised control over "significant aspects" of her employment.   *Barton*, 662 F.3d at 19.

2. Level of skill and expertise necessary to complete the work

HHS argues that Casey's job required a high level of skill beyond "on-the-job training" because the HP coordinator position required a degree in health promotion or a related field, as well as a national certification.  The plaintiff does not contend otherwise.  This factor weighs in favor of independent contractor status. *See Alberty-Velez*, 361 F.3d at 7.

3. Continuing relationship between employer and employee

Casey points to the change in position of STG from contractor to subcontractor as indicative of her ongoing relationship with the defendant. Specifically, the plaintiff argues that despite the fact that STG transitioned from being the contractor with FOH to a subcontractor of Millenium, her duties never changed, and as such STG should be viewed as essentially a "staffing agency." (#147 at 6)  A counterpoint to this characterization is that it was STG's status that

20

changed vis-a-vis FOH; Casey's status as an employee vis-a-vis STG remained unaltered.

Despite the plaintiff's insistence that the continuing relationship strongly supports the inference of an employee/employer relationship, the Court gives this factor minimal weight. There is nothing in the record to suggest that HHS took any action to secure Casey's position during this transition from STG to Millenium. Moreover, there is substantial evidence to support a finding that STG was, in fact, her employer.

4. The right to assign additional tasks or projects to the employee

Casey claims that she taught health and wellness classes at Hanscom based on a curriculum developed by *both* Burk and FOH.[21] (#151 at 14-15) She further asserts that Burk evaluated Casey's performance based on standards established by FOH. (#151 at 20) The defendant does not deny that FOH may have established the basic framework of Casey's employment, but those parameters were the end of the agency's involvement.

The government must take some supervisory role with contractors. This fact

---

[21]Burk was clear that she took the lead on developing Casey's classroom materials and that the only FOH involvement was setting the minimum number of hours and classes, as well as hosting the online system where the materials were located. (#151 at 9) Burk also noted that any marketing issues that were not handled personally would be brought by Casey to an AFMC employee. (#151 at 10)

does not establish a employer/employee relationship.  To permit Casey's

generalized argument to carry the day would be to leave the government open to

suit from virtually every contracted employee under the theory that any

government involvement with a contractor's employee equates to an

employer/employee relationship.

    5. Employer sets the number of hours of work and the duration of the job

    Casey notes that the particulars for her position were set out in a contract

between FOH and Millenium.  The contract specified that there was to be one HP

Coordinator assigned to Hanscom, the number of hours per year the person must

work, and an hourly rate that the contractor would receive for the worker's hours.

The contract also set out the necessary qualifications of, and tasks assigned to, the

HP Coordinator.  Section 10.10 of the contract provides the guidelines, as

established by FOH, that Millenium staff, specifically HP coordinators, are

required to follow with regard to working locations and hours.  That being said, it

is clear from Burk's testimony that AFMC, not FOH, worked in collaboration with

her to set the minimum number of classes to be taught by Casey.  (#139 at 8)

Further, because she worked at a secure military facility, it was AFMC that

controlled Casey's access to, and hours on, the base.

    Another point of contention is that Casey's hours were logged on an FOH

22

system.  Burk testified that Casey logged her hours into an FOH system for "time and quality assurance and quality control."  (#139 at 8)  As previously noted, FOH used the inputted information to bill its clients.  This fact alone does not suggest the type of control that has held to be indicative of an employee/employer relationship.

6. Worker does not hire assistants

The plaintiff argues that she did not hire assistants and did not have the authority to do so, factors which purportedly evidence an employer/employee relationship.  (#147 at 9)  In this case, that factor is of minimal, if any, relevance. There were only thirty CHPS personnel in total, assigned to eight different Air Force bases.  Burk explained that there was no need for more than one CHPS employee at Hanscom because of the small size of the base.  (#139 at 5)  In these circumstances, the inability to hire assistants is not indicative of an employer/employee relationship.

7. Employer provides benefits/payment

The plaintiff does not dispute that STG, not HHS,  paid her salary and provided her with insurance and other benefits.  These are pivotal factors in analyzing whether Casey was an independent contractor.  *Alberty-Velez*, 361 F.3d at 8-9.

8. Considered an employee for tax purposes

Casey received her W2 forms from STG.  She was never considered an employee of HHS for tax purposes.  This factor is very suggestive of independent contractor status.

9. Ability to employ/terminate

The ability to employ and terminate Casey is contested by both parties. The First Circuit has repeatedly held this factor to be a strong indicator of the type of control that exists in an employee/employer relationship.

      i. Employment

The defendant argues that Casey was hired by STG.  Challenging this assertion, Casey directs the Court to the contract between Millenium and HHS, specifically Section 5.2 which requires the contractor, in this case Millenium, to submit a candidate list for HP Coordinator positions to the COTR for review before being hired.  (#148-5 at 15)  Casey cites to *Halpert v Manhattan Apartments, Inc.*, 580 F.3d 86 (2d Cir. 2009) to illustrate that an independent contractor can act as an agent, or apparent agent, of the company with regard to hiring.

*Halpert*, an ADEA case, stands for the proposition that "[i]f a company gives an individual authority to interview job applicants and make hiring decisions

24

on the company's behalf, then that company may be held liable if that individual

improperly discriminates against applicants on the basis of age." *Halpert*, 580

F.3d at 88.  The Second Circuit clarified a company's potential liability in this

situation: "A company is not, of course, liable for the hiring decisions made by

independent contractors who are hiring on their own behalf." *Id.*

　　The relevant contract here provides for the COTR to review the potential

candidates, not to make a hiring decision.   There is no evidence that FOH made

any hiring decisions with respect to the plaintiff, or that Casey was somehow hired

on behalf of FOH and not simply as employee of STG.

　　　　ii. Termination

　　Casey cites to an email from Susan Steinman to Kari Lockett (#148-12) as

evidence that HHS had the authority to terminate.  Upon closer examination of the

email communication, it is clear that Steinman was simply expressing her opinion

on the matter and was not asserting her authority as an HHS employee.  Steinman

stated that "Judy [Holl] would like [Casey] removed from the program . . . and is

requesting her dismissal" and followed this statement by expressing her support for

Judy's request.

　　Perhaps the most compelling example of FOH's potential involvement in the

plaintiff's termination is the statement "FOH is drafting the necessary documents

to terminate by the end of the week" made by Burk in an email to Holl addressing Casey's status.  However, when taken in context it becomes clear that Burk was referring to Casey's removal from her position at the base.  Reviewing several other emails sent between Burk and Holl on the same day only a few hours earlier, it is plain that the priority was to have Casey, a security threat, removed from the base.  This email exchange shows that AFMC sought to have the plaintiff removed from the premises, not that the agency sought her termination.  Indeed, STG relied on documentation from AFMC, not HHS, to support Casey's removal from Hanscom.  Contreras of STG testified in her deposition that she, along with Denise James, another STG employee, informed Casey that there was no other available placement for her within STG and fired her.  (#139 at 38)

As support for its position that HHS could not terminate Casey, the defendant cites to statements made by Steinman and Holl to the effect that they did not have the authority to terminate Casey, and that they could merely request that she be removed from the base.  HHS also provides the relevant section of the STG employee handbook (#156-2) which states that Casey was employed "at will" by STG and could be terminated by STG under her employment contract.  (#156-2 at 8)  The rehire agreement Casey signed with STG incorporates the same "at will" employment status and ability for STG to terminate.  (#137-2 at 2)

26

The plaintiff misses the mark in her attempt to demonstrate that HHS had the ability to terminate her employment.  The authority to remove an individual from a secure facility does not equate to the ability to terminate that individual.

10. Parties' subjective beliefs

Neither HHS nor Casey believed that she was a government employee. HHS points to the subcontract between Millenium and STG which explicitly states under section C.5 "[a]ll persons furnished by Subcontractor [STG], including subcontractors, shall be considered solely Subcontractor's employees or agents . . . ." (#137-1 at 8)

Casey does not contest these facts.  Instead, she argues that subjective beliefs should not be given substantial weight in the Court's analysis.  The cases upon which Casey relies do little to bolster her argument.  For example, contrary to Casey's position, *Delia v. Verizon Communications Inc.*, 656 F.3d 1 (1st Cir. 2011) does not stand for the proposition that subjective beliefs are irrelevant.  Rather, the Court in *Delia* held that the plaintiff's "conclusory statement" that she was an employee was "of little utility" because she failed to adduce any evidence beyond her own affidavit to support this conclusion.  *Delia,* 656 F.3d at 4.[22]  In *Ocasio v.*

---

[22]

Of note, in *Delia* the parties were at odds as to the subjective belief regarding the plaintiff's employment status.

*RAAD Broadcasting Corp.*, 954 F. Supp.2d 67 (D.P.R. 2013), the Court merely

noted that the agreed upon label of the plaintiff's status is not conclusive on its

own and should be evaluated as part of a larger analysis. *Ocasio,* 954 F. Supp.2d

at 5-6.  Finally, *Eisenberg,*  237 F.3d at 116, stands for the proposition that

employers cannot contract out their potential liability.

In short, the plaintiff's position that subjective beliefs are "largely

irrelevant" is unavailing, and as such the Court shall consider this factor in its

analysis.

*B. Casey's other arguments*

Casey argues that the client's preference, in this case AFMC, does not shield

HHS from liability.  In the plaintiff's view, any action by AFMC is attributable to

HHS.  The defendant relies on *Toy v. Holder*, 714 F.3d 881 (5th Cir. 2013) as

being analogous to the instant case.   *Toy* addresses the national security exception

under 42 U.S.C. § 2000e-2(g) to Title VII claims.[23]  While there is no evidence as

---

[23]

The statute provides:

> Notwithstanding any other provision of this subchapter, it shall not
> be an unlawful employment practice for an employer to fail or
> refuse to hire and employ any individual for any position, for an
> employer to discharge any individual from any position, or for an
> employment agency to fail or refuse to refer any individual for
> employment in any position, or for a labor organization to fail or
> refuse to refer any individual for employment in any position, if--
> (1) the occupancy of such position, or access to the premises in or

to Casey's level of security access, it is clear from the communication by Judy

Holl, the team leader for the Occupational Health and Wellness branch of AFMC,

that AFMC was concerned about Casey's presence on the base while being

unresponsive to her AFMC contact person (Captain Norris, the Flight

Commander). (#155-4 at 8-9)  It is evident from Holl's email to Burk that her

concern was to "remove [Casey] from the base."   The email does not address the

issue of Casey's ultimate termination.

Next, in the plaintiff's view, a finding against her based on the evidence

presented would leave the government immune to suit because every plaintiff

would be considered a contractor and not an employee for Title VII purposes.

This assertion is unfounded and the case law Casey cites is readily distinguishable.

The decision in *Hurst v. Buczek Enterprises, LLC*, 870 F.2d 810 (N.D. Cal. 2012)

applied the "California test of employment" as described in *Narayan v. EGL, Inc.*,

616 F.3d 895 (9th Cir. 2010).  *Hurst*, 870 F.2d at 826.  The Court in *Narayan*

---

upon which any part of the duties of such position is performed or
is to be performed, is subject to any requirement imposed in the
interest of the national security of the United States under any
security program in effect pursuant to or administered under any
statute of the United States or any Executive order of the
President; and (2) such individual has not fulfilled or has ceased to
fulfill that requirement.

Title 42 U.S.C. § 2000e-2(g) (2014).

explained that once a plaintiff makes out his prima facie case by demonstrating that he performed work and labor for the alleged employer, a rebuttable presumption of an employment relationship attaches that the defendant must disprove.  *Narayan*, 616 F.3d at 900.  The First Circuit does not follow the California approach, i.e., there is no rebuttable presumption under the law of this circuit.

The First Circuit has established that Title VII issues must be decided on a case-by-case basis because they are fact dependent.  Thus, a finding that Casey was not a government employee would show only that the facts of this case did not support that conclusion, not that the government is immune to suit.

Casey's final argument seeks to dispel the notion that if the Court ruled in her favor it could potentially have the sweeping effect of making all government contractors employees under Title VII.  To support her position, Casey suggests that the government can modify the terms of its contracts to retain less control.  This would require the government to take an almost entirely hands off approach with all of its outside contractors, which goes against settled case law and would essentially hamstring the federal government with regard its ability to contract.

## V. Conclusion and Order

All of the substantial relevant factors weigh heavily in favor of finding Casey's status to be that of an independent contractor, and not a government

30

employee, throughout the course of her time at Hanscom.  No reasonable jury could find otherwise.  As a consequence, Casey's Title VII claim must fail and HHS is entitled to the entry of judgment as a matter of law on Count V of the third amended complaint.

For all of the reasons stated, the United States Department of Health and Human Service's [sic] Motion for Summary Judgment (#136) is ALLOWED. Judgment shall enter for the defendant HHS.


                                              /s/ M. Page Kelley
                                              M. Page Kelley
December 24, 2014                             United States Magistrate Judge